42 N.J. Super. 95 (1956)
126 A.2d 32
NANCY BOTTA, PLAINTIFF-APPELLANT,
v.
HERMAN G. BRUNNER, ET AL., DEFENDANTS-RESPONDENTS.
Superior Court of New Jersey, Appellate Division.
Argued September 24, 1956.
Decided October 18, 1956.
*99 Before Judges GOLDMANN, FREUND and CONFORD.
Mr. Samuel A. Larner argued the cause for plaintiff-appellant (Messrs. Budd, Larner & Kent, attorneys).
Mr. Robert Shaw argued the cause for defendant-respondent Herman G. Brunner (Messrs. Shaw, Pindar, McElroy & Connell, attorneys).
Mr. Philip A. Lustbader argued the cause for defendant-respondent Leo Frieband (Messrs. Schneider & Schneider, attorneys).
The opinion of the court was delivered by CONFORD, J.A.D.
Plaintiff was an invitee passenger in an automobile being driven by the defendant Brunner when it collided August 2, 1953, at the intersection of Laurie Road and Matthew Court, Roxbury Township, with a car operated by the defendant Frieband. Trial of this action in the Law Division for the recovery of damages for plaintiff's resulting injuries culminated in a jury verdict for the plaintiff against the defendant Brunner for $5,500 and of no cause of action in favor of the defendant Frieband. A motion for a new trial, based primarily upon the alleged insufficiency of the damage award, and raising a number of asserted trial errors, was denied, and the same points are the grounds of the present appeal. Plaintiff seeks a new trial on all issues against both defendants.
A proper understanding of the basis for our conclusion that there was a prejudicially erroneous charge to the jury by the trial judge requires a close look at the evidence bearing upon the most seriously contested issue in the cause  the extent of plaintiff's disabilities following the accident and *100 the degree of their proper attribution to the injuries she sustained therein.
Plaintiff was a woman of about 40, with two children, 13 and 11, separated from her husband, and employed as an I.B.M. machine operator in a department store. She was apparently in good health prior to the accident.
Immediately after the accident plaintiff was taken by ambulance to the Dover General Hospital, where X-rays were taken and injections administered to relieve pain. After several hours she left the hospital to go to her brother's bungalow at nearby Lake Hopatcong. She was given sedatives by a local physician, Dr. Gianni, for extreme pain "in the lower spinal column." He testified she was then "in somewhat of a shock condition" and that "she had some bruises * * * of her leg, contusions and abrasions" in addition to spinal "extreme tenderness." Late in the evening of the next day, August 3, at her own request, she was transported in a station wagon to her home in Brooklyn, lying on a board and mattress. In the absence of what her council describes as "her family orthopedist, Dr. Magilligan," she called a Dr. Fett, who directed her removal in an ambulance to Long Island College Hospital, and this was done August 5. She was treated there for three weeks and out-fitted with a surgical steel corset by Dr. Fett. She described her state of disability after returning home, and at the time Dr. Magilligan saw her, September 7, 1953, as follows:
"I didn't move off that orthopedic bed. I was fed. I used the bedpan. I couldn't sit nohow. I just had to lay flat. * * * I couldn't move anything. My whole back, my legs, my head, all my whole body was paralyzed. I just couldn't move. * * * I couldn't pick up my head to even take a glass of water. I had to drink with a tube."
On Dr. Magilligan's first examination of her, she testified, he told her she had "very severe back injuries," she should "stay laying down" and "get an infra ray lamp." She thereafter visited his office every three weeks and was given diathermy treatments and prescriptions for sedatives. By the end of December 1953 the upper portion of her back improved, *101 she said, so that she could half sit up a little and could feed herself but still "was laying down most of the time." But she could not get up or walk. Her middle and lower back pain remained the same. Dr. Magilligan then sent her to the Holy Family Hospital in Brooklyn, and she received "nerve block" treatment. He also ordered her a plaster of paris cast, which she said she wore four months after December 1953. During that entire period, she said, she couldn't get out of bed, even for eating or bodily functions. Her pain was continuous. Yet Dr. Magilligan "made me go to his office for treatments." She got into the car with assistance. Later the cast was altered so that it could be removed. She wore it until August 1955. As of the trial, in January 1956, she was doing limited housework but was suffering continual pain, whether lying down or standing up.
Dr. Magilligan's testimony was taken in New York on depositions December 28, 1955 and read into evidence. He is an orthopedic specialist. The first time he saw the plaintiff "she seemed to be * * * in rather acute distress" and complained of severe pain over the entire lower part of her back "from the sacrum to the middle lumbar portion." She had a swelling in the left sacro-iliac region and pain in the left pubic region. There was no other abnormality. A cursory neurological examination was negative. He could not conduct a full routine examination of her back, because she had "difficulty in moving." She "had pain in trying to get into a chair and getting out." He examined her in a room used as "sort of kitchen, living room and general purpose room."
He saw her at his office again September 28, 1953 and found essentially the same conditions, marked limitation of motion, and pain on motion. He suggested she should try to increase her activities. He saw her thereafter at his office from time to time until April 6, 1955. The treatments were mainly to reduce pain. A caudal block was performed for this purpose. There was also a myelogram in June 1954, which was negative. Objectively she showed improvement, but her subjective complaints remained the same. In answer *102 to a question on direct examination as to whether, from September 1953 to April 1955, the plaintiff could carry on her normal endeavors, he said:
"A. My impression during this period of time that she was coming to me, she complained slightly. I know she had some definite injury. I don't think there is any question about it. But the continued complaint of pain later on in the course of this ailment and the variable findings that I recorded gave me the impression that there was not a true organic disorder, and I didn't feel that there was any real skeletal or muscular skeletal pathology herself which prevented her from working, but she did develop a mental attitude, * * *."
He said her continued wearing of the plaster jacket in the later stages of his treatment was contrary to his advice that she gradually remove it. He summed up his general impression of the degree of her injuries as "some moderately severe injuries in her lower back" and said that when he last saw her "there was no residual orthopedic pathology." He said he had never been shown the X-rays taken at the Dover General Hospital and his diagnosis was subject to what such X-rays would indicate. He refused to take any position as to neurological involvement, as being beyond his field.
A New York orthopedist, Dr. Hartley, examined and treated plaintiff on four occasions from January 25, 1955 to December 28, 1955. He testified that the Dover Hospital X-rays (which were missing at the time of the trial) showed a "fracture through the distal end of the sacrum," but that X-rays which he took himself in January 1955 were negative for fracture. He testified that a Long Island hospital X-ray of August 1953 also showed a sacrum fracture, with slight displacement. But the radiologist at that hospital testified that the X-ray in question does not show a fracture. He testified, however, that there was evidence of an "old injury involving the sacrococcygeal region." Dr. Hartley's conclusion was that there had been a fracture of the lower sacrum which had healed, but that there was "most likely * * * some damage to nerve roots, ligaments and muscles of the lower back," although he could not demonstrate this *103 specifically. His recommendation was an exploratory operation "to see if any nerve roots are trapped or damaged," and probably also a spinal fusion.
Dr. Flicker, a neurologist and psychiatrist, testified for the plaintiff to the effect that her disability was an involuntary psychoneurosis "quite marked in extent." The prognosis was uncertain. He attributed it to the accident, but conceded, on cross-examination, that the background of her previous desertion by her husband and of the enforced care of her two children, both of them polio victims, while working to support them, may have been a contributing factor. He also said that she had a peculiarly slow gait but that it got worse when she knew he was observing her.
Dr. Flanagan, an orthopedic specialist, testified that plaintiff had originally sustained a moderate sprain of the lower back area but that her disability was due more to her extremely poor posture, a defect not attributable to trauma but of long standing. He examined her June 2, 1955. He found simulation of restriction of motion in that, when asked to bend forward from a standing position, she could produce no more than 20 degrees of flexion; but that, when seated on the examining table with outstreched legs, she was able to bend forward and touch her toes with her fingers, an effort substantially greater than indicated by her purported ability to bend when standing.
There was conflicting evidence on numerous other details of purported disability and injury, some of it bearing decidedly upon plaintiff's credibility. We have recited sufficient to indicate that the range of possible estimates of disability and pain, past and prospective, reflected by the evidence and permissible inferences therefrom, was very wide. Plaintiff points to special damages of $8,224.39 as of the date of the trial, medical being $1,978.39, domestic help $496, and loss of salary $5,750. A further exploratory operation would entail expenses of $3,000. She therefore argues that the jury verdict of $5,500 is on its face unconscionably inadequate. We think not. If the jury entertained the conclusions and inferences from the evidence most favorable *104 to defendants it could have decided that much of plaintiff's medical outlay and loss of salary was unnecessary and her disability substantially simulated or exaggerated. Cf. Panko v. Grimes, 40 N.J. Super. 588 (App. Div. 1956).
But the very closeness of the issue as to damages highlights the portion of the charge of the trial judge to the jury under attack by plaintiff as to the requisite evidential showing of relationship between the accident and the damages asserted. Near the close of the charge upon the applicable law the trial judge stated:
"I think I have already charged you with regard to the responsibility of Mrs. Botta to prove by clear, convincing evidence that her injuries were the result of this accident, and that she is only to recover for those injuries which were probably the result of this accident. If it is only a mere possibility, you disregard those that come within the realm of a possibility; it must be probable; because I suppose anything in life can be possible." (Emphasis supplied.)
Appropriate exception was taken to this part of the charge. The judge had not, in fact, "already charged" to the effect stated. But he may have had in mind his previous charge that:
"The plaintiffs have the burden of proving what injuries were the natural and proximate result of the defendants' negligence, and the law casts the burden on them. The evidence must establish with reasonable certainty that the injuries and losses for which you award any damages are properly attributable to the accident. You may not guess at it; you may not conjecture. * * * The law does not permit you to speculate. The evidence must, therefore, establish with reasonable certainty the nature, extent and probable duration of the personal injuries resulting from the accident, and must establish that any expenses for doctor bills, hospital bills, nurses, loss of wages, earnings, and so forth, were the natural. direct and proximate result of the accident." (Emphasis supplied.)
No exception was taken to the foregoing language, specifically. There can be no doubt that the court's imposition upon plaintiff of the burden of producing "clear, convincing" evidence that her claimed "injuries," easily to be understood by the jury in the added sense of disabilities, *105 were the result of the accident, assessed her with a probative burden exceeding what the law calls for in an ordinary civil action. See Davidson v. Fornicola, 38 N.J. Super. 365, 372 (App. Div. 1955), where a charge requiring the plaintiff to carry his burden by a "clear preponderance" of the believable evidence was expressly disapproved as likely to "collide with the purposeful and distinguishable requirement and standard of `clear and satisfactory' and `clear and convincing' proof," well established in the law as peculiarly applicable to special situations appropriately evocative of extraordinarily strict standards of proof, as where fraud, parol trusts, forfeiture, reformation or the like are involved. See also proposed Rule 16 of the Uniform Rules of Evidence.
But defendants argue that if the criticized portion of the charge is read with the other parts also quoted above, the supposed harm is removed, the asserted cumulative effect being only to apprise the jury that it must find "non-conjectural, non-speculative" evidence to support plaintiff's claims. Not only do we dissent from this conclusion, but we aver that the references to "reasonable certainty" compounded the prejudicial effect of the error. Flexmir, Inc., v. Lindeman & Co., 4 N.J. 509, 514 (1950). A suitor is not obliged to prove with certainty, reasonable or otherwise, that the defendant's act caused his damage. All that is necessary is proof justifying an inference of probability, as distinguished from mere possibility. Ibidem. Compare the different situation and stricter rule where the issue is loss of profits as an item of damages. Rempfer v. Deerfield Packing Corp., 4 N.J. 135, 144 (1950).
The error here complained of was not corrected elsewhere in the charge. See Guzzi v. Jersey Central Power & Light Co., 12 N.J. 251 (1953). We think the jury here could well have been misled. Middleton v. Public Service Co-Ordinated Transport, 131 N.J.L. 322 (E. & A. 1944). As already indicated, an aura of excessive claim of damages by plaintiff permeated the atmosphere of the trial. The trial court elsewhere in the charge not improperly accentuated the sensitivity of the issue. Contrary to the characterization by *106 the appellate court of the issue related to the criticized charge in the Davidson case, supra (38 N.J. Super., at page 374), the issue of damages in the present case was indeed "such an acutely controversial issue at the trial that the objectionable phrase of the charge constituted a probable determinative influence upon the jury." There must be a reversal of the judgment.
Plaintiff has in her brief raised a number of other alleged errors in the charge. Some go to the matter of damages and may be ignored in view of our conclusion that there must be a new trial as to that issue. Others, however, go to the matter of liability and must be considered in view of the jury's exculpation of the defendant Frieband.
The court told the jury that it should consider whether the roads were private or public. But since it also charged that the standard of care in either event was the same plaintiff was not prejudiced.
The trial judge charged that "occasionally an unforeseeable accident does occur in which no one is at fault." Whether or not this issue was properly in the case, there was no prejudice since the verdict indicated a rejection by the jury of the theory of unavoidable accident.
Plaintiff objects to the court illustrating by examples the rule that violation of a traffic statute is not necessarily negligence. We do not regard the charge as inappropriate in the light of the evidence in this case as to how the accident happened. See infra.
Plaintiff argues that the charge as a whole and the comments on the evidence and the law in relation to the facts were "unduly weighted" in favor of the defendants. If the implication is that this was done in order to prejudice the plaintiff's case, it is unwarranted by anything disclosed by this record. If the contention is only that the effect of the comments by the court is as stated, there is no just cause for complaint, since there is plenary authority in the trial court to comment on evidence, even to the extent of strongly influencing the jury, so long as it is left to the jury, as it was here, to rely upon its own recollection of the testimony *107 and to draw its own conclusions in arriving at a verdict. Jones v. Lahn, 1 N.J. 358, 362 (1949); Hare v. Pennell, 37 N.J. Super. 558, 566 (App. Div. 1955).
Complaint is made of the failure of the trial court to charge a number of plaintiff's requests to charge. We have examined all of these and find no prejudicial error, the charge having adequately covered the points raised.
Although there must be a new trial as to damages, we consider plaintiff's point of objection to the curtailment of her counsel in summing up as to damages worth our attention, in view of the possible recurrence of the question on the retrial and the interest of the trial bar in the subject.
In summation counsel for plaintiff said, in discussing damages:
"You must add to that, next, the pain and suffering and the disability that she has undergone from August 2nd, 1953 to now. Take that first. That is 125 weeks of pain and suffering. Now, that is difficult to admeasure, I suppose. How much can you give for pain and suffering? As a guide, I try to think of myself. What would be a minimum that a person is entitled to? And you must place yourself in the position of this woman. If you add that disability which has been described to you, and you were wearing this 24 hours a day, how much do you think you should get for every day you had to go through that harrowing experience, or every hour?
Well, I thought I would use this kind of suggestion. I don't know. It is for you to determine whether you think I am low or high. Would fifty cents an hour for that kind of suffering be too high?"
Counsel for one of the defendants interrupted and asked for a mistrial on the basis of the alleged impropriety of the argument. This was denied, but the trial judge admonished plaintiff's counsel that "Your argument is improper as the measure of damages for pain and suffering" and directed discontinuance of that line of argument. While we cannot say that the action of the trial court was necessarily prejudicial to plaintiff in the background of this particular case, we see no logical reason why the fair scope of argument in summation by trial counsel should not be permitted to include mention of recovery in terms of amount. It is well *108 settled that counsel may advise the jury as to the amount sued for, Rhodehouse v. Director General, 95 N.J.L. 355 (Sup. Ct. 1920), and we have recently held that he may state his opinion that the jury should allow a stated amount short of the sum sued for. Kulodzej v. Lehigh Valley R. Co., 39 N.J. Super. 268 (App. Div. 1956).
The argument is sometimes heard that since there is no evidence in the case as to how much pain and suffering, or a given physical disability, is worth in dollars, and since it is the exclusive function of the jury to fix the amount by its verdict, counsel should not be allowed to ask the jury to return a named amount. Stassun v. Chapin, 324 Pa. 125, 188 A. 111 (Sup. Ct. 1936). We do not think this follows. Counsel may argue from the evidence to any conclusion which the jury is free to arrive at, and we perceive no sound reason why one of the most vital subjects at issue, the amount of recovery, should not be deemed within the permitted field of counsel's persuasion of the jury by argument. This, within reasonable limits, includes his supporting reasoning, as in the present case, whether soundly conceived on the merits or not. Cf. Standard Sanitary Mfg. Co. v. Brian's Adm'r, 224 Ky. 419, 6 S.W.2d 491, 493 (Ct. App. 1928); Dean v. Wabash R. Co., 229 Mo. 425, 129 S.W. 953, 962 (Sup. Ct. 1910). If necessary, the trial court can in its instructions caution the jury that the argument does not constitute evidence as to the amount of damages.
The next matter for determination is plaintiff's contention that the remand on reversal herein should direct a new trial as to the issue of liability of the defendant Frieband as well as that of damages as to both defendants. We are not persuaded why. There is every indication that the jury fairly settled the question of liability by its verdict. The defendant Frieband testified that as he drove along Matthew Court approaching its intersection with Laurie Road, he slowed almost to a stop, looked up Laurie Road, saw nothing, his vision being hampered by foliage, and was crossing the intersection slowly when he saw the Brunner car, and attempted to avoid it, but unsuccessfully. Brunner neither *109 saw the Frieband car nor stopped at the intersection, and his vehicle, after the collision, proceeded 100 to 150 feet before stopping. On this evidence the jury was free to decide that the accident was caused solely by Brunner's negligence, Dahle v. Goodheer, 38 N.J. Super. 210 (App. Div. 1955), and there is no reason to deprive Frieband of his fairly won discharge from liability at the hands of the jury by mere reason of the dissociated error by the trial judge for which we are reversing. Cf. Ferry v. Settle, 6 N.J. 262 (1951). By the same token, the adjudication of liability against Brunner should also stand and the retrial be confined to the issue of plaintiff's damages.
One final matter. Plaintiff contends that the circumstances under which the verdict was received were erroneously prejudicial to her and that a mistrial should have been declared. After being out for seven hours, the jury returned to render its verdict. It was announced by the forelady as $5,500 in favor of plaintiff against Brunner, in favor of another plaintiff, Mrs. De Santis, against Brunner for $300 (a verdict not involved in this appeal), and in favor of Frieband as to both plaintiffs. The forelady said the verdict was unanimous, but the court polled the jury and nine answered yes and three no. At the request of counsel for Brunner, the court ordered the jury polled as to each separate claim, and this time the result was nine to three in favor of Botta against Brunner for $5,500, unanimously in favor of De Santis against Brunner for $300, and eleven to one in favor of Frieband as against both plaintiffs. Thereupon the court sent the jury out to continue its deliberations, and in 15 minutes it returned with the verdict noted first hereinabove, and a poll showed it to be unanimous as to each issue.
The argument is that under the circumstances, the jurors having revealed their position in open court, the previously dissident jurors were unduly coerced toward unanimity when sent out again and that this conclusion is supported by the previous long deliberation, the lateness of the evening hour, and the quickness of the final verdict. We do not agree. There is not here presented the case of undue *110 pressure by the trial judge of the jury to arrive at a verdict which was shown in In re Stern, 11 N.J. 584 (1953). The handling of this matter was within the discretion of the trial court and that discretion was not abused. It is the general rule that a jury may be sent out to continue deliberations even after a poll reveals discrepancies between an announced verdict and the position of the individual jurors. 164 A.L.R. 1276, 1277; Olivo v. Strand Engineering Co., 30 N.J. Super. 544 (App. Div. 1951).
Plaintiff also argues that the case of Botta against both defendants was single and that it was therefore improper to poll the jury separately as to the findings respecting each defendant. We think the course here taken was proper, within the authority of Malinauskas v. Public Service Interstate Transp. Co., 6 N.J. 269, 274 (1951).
Affirmed as to the defendant Frieband, with costs. Reversed as to the defendant Brunner and remanded for a new trial as to damages only, costs to abide the event.